

# IN THE
# TENTH COURT OF APPEALS

### No. 10-15-00326-CR

**DUSTIN WEST,**

**Appellant**

**v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 18th District Court
Johnson County, Texas
Trial Court No. F49060**

## MEMORANDUM  OPINION

A jury convicted Appellant Dustin West of capital murder in the death of his girlfriend's two-year-old child.  Because the State did not seek the death penalty, the trial court imposed a mandatory life sentence.  *See* TEX. PENAL CODE ANN. § 12.31(a)(2) (West Supp. 2017).[1]  West appeals in five issues.  We will affirm.

---

[1] This section was amended subsequent to West's conviction, but the amendment does not affect this appeal.

*Background*

Cherice Richey and her two-year-old son, Z.R., moved in with West around the first of August 2013. Less than two weeks later Z.R. was dead. On August 12, 2013, Cherice left Z.R. in West's sole care beginning at approximately 11:00 a.m. At approximately 3:30 p.m., West brought Z.R. to the emergency room at the Cleburne hospital because Z.R. was not breathing. Z.R. was pronounced dead at approximately 4:00 p.m. The medical examiner, after an autopsy, attributed the immediate cause of Z.R.'s death to blunt force injuries to the head and brain, and she attributed the manner of his death to homicide.

*Sufficiency of the Evidence*

In his first issue, West asserts that the evidence was insufficient to sustain his conviction for capital murder. Specifically, West argues that the jury could not have rationally or reasonably inferred that because West spanked Z.R., he therefore also struck Z.R. in the back of the head (or struck the back of Z.R.'s head against another object). West further argues that there was no evidence from which the jury could infer that West caused Z.R.'s death knowingly.

The Court of Criminal Appeals has expressed our constitutional standard of review of a sufficiency issue as follows:

> In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);

> *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011).

The Court of Criminal Appeals has also explained that our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). If the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Jackson*, 443 U.S. at 326, 99 S.Ct. at 2793. Further, direct and circumstantial evidence are treated equally: "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13. Finally, it is well established that the factfinder "is entitled to judge the credibility of witnesses, and can choose to believe all, some, or none of the testimony presented by the parties." *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *Gerron v. State*, 524 S.W.3d 308, 317 (Tex. App.—Waco 2016, pet. ref'd).

We measure the sufficiency of the evidence by the elements of the offense as defined in a hypothetically correct jury charge for the case. *Cada v. State*, 334 S.W.3d 766, 773 (Tex. Crim. App. 2011). Such a charge would be one that accurately sets out the law,

is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.*; *Gollihar v. State*, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001). The law as authorized by the indictment means the statutory elements of the charged offense as modified by the charging instrument. *See Gollihar*, 46 S.W.3d at 254.

The indictment charges West with knowingly causing the death of Z.R., who was younger than ten years of age, by striking him with or against an unknown object. An individual commits capital murder if he intentionally or knowingly murders an individual under ten years of age. TEX. PENAL CODE ANN. § 19.03(a)(8) (West Supp. 2017).[2] "A person acts knowingly, or with knowledge . . . of his conduct when he is aware that his conduct is reasonably certain to cause the result." TEX. PENAL CODE ANN. § 6.03(b) (West 2011). Knowledge is a fact question for the jury and is almost always proven through the circumstances surrounding the crime. *See Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998); *see also Lee v. State*, 442 S.W.3d 569, 580 (Tex. App.—San Antonio 2014, no pet.). A culpable mental state may be inferred from: (1) the acts, words, and conduct of the accused; (2) the extent of the injuries to the victim; (3) the method used to produce the injuries; and (4) the relative size and strength of the parties. *Rhymes v. State*, 536 S.W.3d 85, 95 (Tex. App.—Texarkana 2017, pet. ref'd). Injury to a child cases are

---

[2] This section was amended subsequent to West's conviction, but the amendment does not affect this appeal.

particularly dependent upon circumstantial evidence because "there is rarely direct evidence of exactly how the child's injuries occurred." *Williams v. State*, 294 S.W.3d 674, 683 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). A defendant's changing narrative of how a child's injuries occurred provides circumstantial evidence of guilt. *Bearnth v. State*, 361 S.W.3d 135, 140-41 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Kemmerer v. State*, 113 S.W.3d 513, 515 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (jury could have viewed as evidence of guilt that child's injury required more force than defendant's explanation of short fall and defendant's changing explanations). Additionally, a defendant's sole access to a child at the time the child's injuries were sustained provides circumstantial evidence that the defendant was the cause of those injuries. *Bearnth*, 361 S.W.3d at 140. "Texas case law is replete with holdings that when an adult defendant has had sole access to a child at the time its injuries are sustained, the evidence is sufficient to support a conviction for injury to a child, or murder if the child dies." *Garcia v. State*, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref'd).

It is undisputed that Z.R. was under ten years of age and that he was left in West's sole care shortly before he died. It is also undisputed that there was a discrepancy in size between West, an adult male, and Z.R., a two-year-old child. The evidence at trial reflected that Z.R. had extensive injuries all over his body, that those injuries were inconsistent with West's version of events, and that West gave conflicting versions of how Z.R.'s injuries occurred. As West did not testify, his version of the events surrounding Z.R.'s death comes from his statements to others.

Events Preceding Z.R.'s Death.[3]  The evidence, viewed in the light most favorable to the verdict, establishes:  Cherice and West met in December 2012, they began dating in early 2013, and they moved in together in August 2013, with Cherise bringing along her two-year-old son, Z.R.  In a series of texts in the days prior to Z.R.'s death, West accused Cherice of babying Z.R. and believed that Z.R. hated him.  West also texted that Z.R. needed his "butt whooped" and that Z.R.'s constant whining would have to stop.  Additionally, West and Z.R. never spent any significant time alone together before Cherice and Z.R. moved in with West.  West watched Z.R. and West's son B.W. once while Cherice was taking a test, and the week prior to Z.R.'s death, West was alone with Z.R. for approximately one hour.  Z.R. suffered no injuries on either occasion.

Z.R. had no medical problems other than asthma and a minor hip dysplasia that did not hinder his walking.  The evening before Z.R.'s death, Cherice observed no bruises or other injuries on Z.R. when she gave him a bath other than some healing ant bites.  On the day of Z.R.'s death, Cherice agreed to take her brother's daughter and step-daughter to a doctor's appointment.  While Cherice originally planned to take Z.R. with her, West volunteered to keep Z.R. and put him down for a nap after they ate lunch.  Approximately twenty minutes prior to her departure, Cherice took a picture of West and Z.R. urinating off the back porch and again observed no bruises or other marks on Z.R.

Cherice left West's residence at approximately 11:00 a.m., and West called her at approximately 1:30 p.m. to tell her that he spanked Z.R. because Z.R. threw his sippy cup

---

[3] The chronology of events is based upon the testimony of Cherice and the text messages exchanged between Cherice and West on the day of Z.R.'s death.

at him. Cherice was angry with West because she had told him on a previous occasion when he spanked Z.R. that she did not discipline Z.R. in that manner. West told Cherice that Z.R. was taking a nap, and she asked West to send her a picture of Z.R. The picture West sent to her showed Z.R. lying on a bed on his stomach with his head turned away from the camera. Z.R. was fully clothed, and his face was not visible in the picture. Approximately seven minutes later, West texted Cherice to tell her that Z.R. had fallen and that he had hit his head. The text stated: "Z just fell out of the truck. I went around to open his door cuz we took trash to the dumpster and he opened and tried to jump out. I didn't get across in time. I feel terrible. He hit his head pretty hard. I think he's okay though." Cherice testified that West told her the incident happened at the dumpster. Cherice asked West to send her a picture of Z.R.'s injury, but West did not do so. West called and told her that Z.R. cried after he fell, but Cherice did not hear Z.R. crying in the background during the call. Cherice asked to speak to Z.R., but West quickly changed the subject, distracting her and telling her that Z.R. was fine. At 1:44 p.m., West sent Cherice another text that stated: "Poor guy tripped and fell on the step in between our room and the laundry room too." West told her that Z.R. was still fine after this second fall and that he was taking a nap. Cherice texted West and told him not to let Z.R. go to sleep.

Cherice called Z.R.'s doctor after West told her about Z.R.'s head injury, but was unable to reach him until the office reopened at 2:00 p.m. At 1:49 p.m. West texted her to ask where Z.R.'s doctor was located. Cherice responded that the doctor's office was closed until 2:00 and that she would call again once the office opened. She also texted, "I

don't want to take him to cooks' cuz CPS gets involved for all head injuries." Cherice attributed that comment to bad advice from others because she took Z.R. to the doctor so often. Once Cherice got in contact with Z.R.'s doctor's office, the nurse she spoke with told her to apply ice packs to the injury—twenty minutes on and twenty minutes off—and Cherice gave that information to West. Cherice testified that between texts, she spoke with West on the phone and made plans to meet and take Z.R. to the doctor's office. At 2:14 p.m. West texted her wanting to know when she was coming home. Cherice texted West at 2:15 p.m. asking what Z.R. was doing. West responded that Z.R. was asleep. A few seconds later, West texted that Z.R. was watching Tractors. Cherice responded, "O.K." Approximately five minutes later West texted:

> I know. I did what I would have done with [B.W.]. I told him to wait. I know he's two but I know he understood me and I hauled ass around to open his door because he still had his seat belt on. I did make him buckle up but by the time I got around the truck he had the belt undone and his door open and he fell face first. You don't know how upset this makes me at myself.

At 2:44 p.m., West texted again asking where Cherice was. She responded two minutes later that she was walking out of the doctor's office. West texted again at 2:47 p.m. and informed her that Z.R. was still watching Netflix. Her response was, "Okay." West then asked again where she was, and she responded that she was taking the girls home. West then texted that Z.R. was just "laying" there and wanted to know whether he should get him up to see if he wanted to play. Cherice responded, "Yeah." West replied, "Okay, will do." At 3:14 p.m. West texted Cherice to tell her that Z.R. was lying down and crying for her. He texted, "He cannot go to sleep, correct?" Cherice responded, "Correct." West

then called Cherice at 3:20 p.m. and told her that Z.R. wasn't breathing. Cherice told West to call 911, and she drove to the hospital. Cherice noted that when she arrived at the hospital Z.R. was surrounded by a crowd of medical personnel and that there were also a number of law enforcement personnel present. Cherice testified that she thought she heard someone say that Z.R. had a heartbeat and that they were giving him IV's, but Z.R. was pronounced dead at 4:05 p.m.

Severity of Z.R.'s Injuries. As noted, West argues that there was no evidence from which the jury could infer that he knowingly caused Z.R.'s death. However, the severity of the injuries suffered by a child can be circumstantial evidence of the necessary mental state. *Rhymes*, 536 S.W.3d at 95.

Dr. Tasha Greenberg, a deputy medical examiner at the Tarrant County Medical Examiner's Office in Fort Worth, performed the autopsy on Z.R. She testified that the information she was provided regarding the cause of Z.R.'s injuries was that he fell out of the cab of a parked pickup truck, that he landed on his head, and that he fell a second time on a low step striking his abdomen. Dr. Greenberg testified that she noted the following injuries on Z.R.:

a)  A complex, depressed skull fracture on the left rear of the skull, with radiating fractures extending to the base of the skull;

b)  Numerous contusions on the head, with significant bruising on the left side of the forehead, towards the front of the forehead, on the right side of the forehead, on the left upper eyelid, and other contusions in the temple area, on both cheeks, on both ears, an abrasion on the nose, as well as an abrasion behind the right ear and a patterned contusion on the chin;

c) Multiple areas of hemorrhaging on the brain extending from under the scalp to inside the brain and into the spinal cord;

d) Hemorrhaging of the left eye through all levels of the retina into the optic nerve and swelling of the optic nerve;

e) Contusions on the torso, buttocks and extremities, some patterned, that were consistent with being struck with a flat object rather than something with a sharp edge;

f) Hemorrhaging in the muscles on the side of the chest;

g) Contusion on the right lower lobe of the lung;

h) Contusion on the left kidney; and

i) Bleeding in the tongue.

Dr. Greenberg testified that the hemorrhaging under the scalp reflected that the wounds were inflicted recently. She further testified that the skull fracture was consistent with an inflicted injury and would require significant force. From the photographs of Z.R. after his death, it appears that the "patterned" contusions on his chin appear to be finger or thumb prints.

Dr. Greenberg further testified that in a pediatric death the cause and manner of death are usually determined after a conference with other medical examiners who reach a consensus opinion. In this case, the other medical examiners unanimously agreed with Dr. Greenberg's conclusions regarding the cause and manner of death, including Dr. Nizam Peerwani, Chief Medical Examiner, Dr. Marc A. Krous, Chief Deputy Medical Examiner, Dr. Susan Roe, Deputy Medical Examiner, and Dr. Richard C. Fries, Deputy

Medical Examiner. The consensus was that the immediate cause of death was blunt force injuries of the head and brain and that the manner of death was homicide.

The medical professionals from the Cleburne hospital emergency room who viewed Z.R. were in agreement that Z.R.'s death was not accidental.

Conflicting Versions of How Z.R.'s Injuries Occurred. West's texts and phone calls to Cherice provide his initial version of how Z.R.'s injuries occurred. The basic story West told Cherice and the other witnesses was consistent in the following particulars: (1) Z.R. landed on his head after unbuckling his seat belt by himself, opening the truck door on his own, and falling from the truck; and (2) Z.R. fell a second time and hit his chest on a stair at the house. At the emergency room, West spoke with medical personnel and law enforcement investigators. Some of the medical personnel testified that West said Z.R.'s injuries occurred at the dumpster, while others testified that West said they occurred back at his house. The same was true of the testimony of the forensic investigators who investigated Z.R.'s death. Investigator Gary Morris testified that West told him that Z.R. fell out of the truck once they returned to the residence. Investigator Liesl Hoover testified that West told her that Z.R. was injured while they were still at the dumpster, although she admitted on cross-examination that the notes she took at the time of her interview with West indicated that he said the injuries occurred at the house.

Adam Jobe, an administrative nursing supervisor at the Cleburne hospital, testified that he spoke with West soon after West arrived at the emergency room with Z.R. While Jobe testified that West's story was similar to what West told others, West also provided an additional detail not mentioned before—that Z.R. fell forward and hit

the front of his head on what he described as "a soft gravel like drive of some sort." Jobe also reported that West said Z.R. did not act any different than usual after his injuries, although he was a little whiny. When Jobe returned to the examination room to tell the doctor how West said Z.R.'s injuries occurred, he saw the mark on Z.R.'s chest, causing a "red flag" to go off in his head. Jobe testified that he questioned West about the mark and that West told him that while he and Z.R. were watching television, Z.R. got up, started walking across the room and just kind of fell onto some stairs or a step of some type. Jobe further testified that because of the nature of Z.R.'s injuries, he requested that the department secretary contact the police.

West's statements to law enforcement contained additional differences. Kevin George, a deputy sheriff with the Johnson County Sheriff's Office, responded to the Cleburne hospital after Z.R.'s death. George testified that West told him the same story he told to the other witnesses except West told him that Z.R. hit his head on some rocks. George additionally testified that West told him that Z.R. fell the second time while walking into the house or to the house. West also told George that Z.R. stopped breathing while West had gone outside to smoke a cigarette. That was the first instance that West noted he left Z.R. alone for any period of time.

Terry Dalton, another deputy sheriff and a detective with the Johnson County Sheriff's Office, was also dispatched to the hospital after Z.R. was pronounced dead. Dalton and Lanny Boone, the officer in charge, conducted an interview with West while they were still at the emergency room. West gave the following written statement:

Cherice had to take her nieces to the doctor. [Z.R] stayed with me because we were working on potty training. We were picking up the trash in living room, had two trash bags of trash, we went to dumpster to put in trash. I got out to put in dumpster [Z.R.] had my phone playing games. He was buckled up in passenger seat. We turned around, drove back to house, I then killed the truck and told [Z.R.] to hold on that I was going to get him out on his side. I got out and walked around back of truck and by the time I got to back p/s rear he had the door opened, his seat belt unbuckled and opened door and fell and hit his head. He started crying I picked him up and comforted him, told him we needed to go inside, and we went in back door, called his mom and told her what happen, she called family doctor, and gave me the information on what to do. 20 minutes ice on head/20 minutes no ice. We were still in back room, [Z.R.] wanted down so I let him down, his balance was a little off, but he wanted to walk himself, I had to help him with his balance and when we got to laundry room steps he tripped and fell and hit second step right at his chest. He got up, it knocked breath out of him, I picked him up comforted him and took him to the living room and sat him next to me and we started to watch tractors on and everything was fine. He was not falling asleep, I was checking on him as much as possible, he was doing great I thought, I went outside for maybe 2-3 min and I come back inside to living room and he looked to be asleep, I tried to wake him, but he wasn't breathing. I tried to do CPR on him, I really didn't know how but after it didn't work I ran with him, grabbed car seat and drove as fast as I could to the emergency room. I buckled his seat on way to hospital. I held his hand and yelled [Z.R.] but he never woke up. I got him out and took him to ambulance ER entrance. When he fell on step, I did give him a breathing treatment to help with his trouble breathing. The doctor took him from me and took him in the back door.

West's written statement contradicts what he told Cherice and what he said during his 911 call because he notes in the written statement that Z.R. was *not* falling asleep. West noted for the first time that he administered a breathing treatment to Z.R. after Z.R. fell on the steps. West also noted for the first time that he tried to perform CPR on Z.R. before taking him to the emergency room.

Other inconsistencies in West's version of events came out when he was interviewed approximately a week after Z.R.'s death by Natalie Davis, an investigator for

Child Protective Services.  While the outline of the story told to Davis was similar to that told to the other witnesses, West's statements to Davis included the following differences from his earlier statements:  (1) Z.R. usually sat on the middle console when riding in West's truck; (2) when Z.R. opened the door to the truck, he stretched out with the door while still hanging onto the handle; (3) Z.R. landed on the right side of his head when he hit the ground;  (4) Z.R.'s head hit a large flat rock that was in the driveway; (5) West described Z.R.'s injury as a "knot" on his head, no different from other times he had fallen; (6) West noticed that Z.R. had stopped breathing at 1:30 p.m.; and (7) West had taken care of Z.R. "all the time."

Davis testified that West insisted that Z.R. landed on the front of his head even though the fracture on Z.R.'s skull was in the back.  The skull fracture was not immediately apparent as it was covered by Z.R.'s hair.  Davis testified that West maintained that Z.R. fell on the right side of his face until she showed him a photograph that clearly showed the large bruise on the left side of Z.R.'s forehead.  Only then did West indicate that Z.R. fell on the *left* side of his head, although he still indicated that Z.R. landed face first.

Cherice testified that she remained in a relationship with West on and off for over a year after Z.R.'s death and that she either believed or wanted to believe that Z.R.'s death was accidental.  She testified that she initially heard nothing to contradict West's version of events other than what Dalton told her when he interviewed her.  However, during her communications with West in the months after Z.R.'s death, West said a few things that contradicted what he had told her previously.  Cherice testified that a few months

after Z.R.'s death, West told her that he spanked Z.R. because Z.R. threw pizza at him, not his sippy cup as he first told her.  In a text message to Cherice in June 2014, West wrote:

> I'm sick of you blaming me for his death.  So fuck off you white trash bitch. I do wish I would have never met you and wasted almost two years of my life.  And if you were watching him why would you let him stand in an ant bed to get bit as many times as he did?  I know he was in the shop climbing on the creeper stool but I didn't see him fall.  I don't know what else to tell you.  You want answers for something I don't have the answers to.  I apologize for saying white trash bitch and I didn't waste two years of my life.

Cherice testified that was the first time West ever mentioned that Z.R. injured himself on the "creeper" stool rather than falling out of the truck.

Cherice additionally disputed many of the things West told others.  She testified that Z.R. had been able to unfasten the shoulder harness on his car seat, but that he had never unbuckled the seat belt on his car seat or a regular automotive seat belt.  Cherice also testified that Z.R. had never accompanied West to the dumpster before and that Z.R. had never ridden on the center console of West's truck.  Cherice testified that the dumpster was located less than a quarter of a mile from West's house and that it would take approximately twenty seconds to drive there.  She noted that buckling Z.R. in for a twenty-second ride made little sense.

West's Statements Inconsistent With Z.R.'s Injuries.  The emergency room personnel and Dr. Greenberg testified that Z.R.'s appearance and injuries were inconsistent with West's version of events.  The medical professionals from the emergency room testified that the injuries they observed led them to believe that Z.R. had

been beaten and that he had died long before West brought him to the emergency room. Dr. David Lunow, the emergency room doctor who attempted to treat Z.R., testified that his first impression upon viewing Z.R. was that he was dead. Z.R. was taken into a trauma room for treatment out of an abundance of caution after one of the emergency room nurses believed she felt a femoral pulse. Dr. Lunow testified Z.R. had numerous bruises on his head, a linear bruise going from the left of his chest to the right lower abdomen, and a similar linear bruise across his buttocks that he believed could have been made by the same object. Dr. Lunow further testified that in his professional opinion Z.R. had been beaten to death. The medical charge nurse, Carrie Lucus, testified that she did not believe Z.R. was alive when he was first brought into the emergency room as a result of the analysis of his blood. Dr. Lunow testified that he believed Z.R. had been dead thirty minutes to an hour before he was brought to the emergency room.

While the skull fracture and other bruising on Z.R.'s head may have been attributable to a fall from a truck, the other injuries he suffered were not consistent with West's version of events. This is particularly true of the linear bruising on Z.R.'s chest and buttocks that were apparently caused by the same straight, flat object rather than the sharp corner of a stair. West's statements accounted for the bruise on Z.R.'s chest, but not the same bruise found on Z.R.'s buttocks.

The evidence that West was the sole caretaker of Z.R. at the time Z.R.'s injuries occurred, that West gave conflicting stories about how Z.R.'s injuries occurred, and that West's version of events was inconsistent with the severity of Z.R.'s injuries was sufficient

for the jury to find beyond a reasonable doubt that West knowingly inflicted the fatal injuries on Z.R.  West's first issue is overruled.

### *Rule 404(b)*

In his second issue, West asserts that the trial court erred in allowing the State to introduce evidence of extraneous conduct involving West's physical assaults on three women and his use of illegal drugs.  Specifically, West argues that the trial court abused its discretion in admitting the evidence in violation of Rule 404(b) of the Rules of Evidence.

Generally, relevant evidence is admissible unless it is excluded by the United States or Texas Constitutions, a statute, the Rules of Evidence, or other rules prescribed under statutory authority.  TEX. R. EVID. 402.  However, relevant evidence must also pass muster under Rule 404, which excludes the introduction of evidence of a person's character or character traits in order to prove that the person acted in conformity with that character or trait.  TEX. R. EVID. 404(a)(1).  Additionally, Rule 404(b) excludes the introduction of other crimes, wrongs or acts to prove a person's character in order to show that on a particular occasion the person acted in accordance with his character.  TEX. R. EVID. 404(b)(1); *see also Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001).  Extraneous evidence may be admissible, however, for another purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," or when it is "relevant to a noncharacter conformity fact of consequence in the case, such as rebutting a defensive theory."  TEX. R. EVID. 404(b)(2);

*Powell*, 63 S.W.3d at 438; *see also Montgomery v. State*, 810 S.W.2d 372, 377 (Tex. Crim. App. 1991) (op. on reh'g).

Davis, the CPS investigator, testified that West admitted that he had been in trouble as a juvenile when marijuana was found in his vehicle at school. Davis testified that West told her that he also experimented with cocaine and that he began using methamphetamine at age twenty-two. West also told her that he was on probation for possession of methamphetamine and that he had been involved in domestic violence incidents with Cherice, his ex-wife, Madeline West, and his former girlfriend, Carley Hill. West told Davis that both he and Carley used methamphetamine and fought often.

Hill testified about her volatile relationship with West, including her introduction to methamphetamine by him. Hill testified that she was physically abused by West on seven or eight occasions and that she was head-butted, punched, stomped in the head, and choked to the point of convulsions.

Cherice testified that she remained with West on and off for over a year after Z.R.'s death and that he physically assaulted her twice during that time. She testified that the first incident occurred after she disposed of a drug pipe she found in her car. Cherice testified that West screamed at her, spit on her, and then grabbed her and head-butted her more than once. As a result of the assault, Cherice had two black eyes, a swollen nose, bruises, and a busted lip. Charges were filed against West, and they were pending at the time Cherice testified. Cherice testified that a second assault occurred when West became angry after she received a text from a former friend. West again head-butted her on the side of her face and ripped hair extensions from her head. Cherice testified that

the bruises on her face from this assault were similar to those on Z.R.'s face, although Z.R.'s were worse. Cherice was a small woman. She testified that she was four feet, eleven inches tall and weighed 117 pounds at the time of trial.

The State first argues that West waived any issue concerning a violation of Rule 404(b) because his objection at trial referred only to Rule 403. To preserve error for appellate review, a party must present a timely request, motion or objection to the trial court, state the specific grounds for the objection, and obtain an adverse ruling. *See* TEX. R. APP. P. 33.1(a)(1); *see also Luna v. State*, 268 S.W.3d 594, 604 (Tex. Crim. App. 2008). West argues that he objected under Rule 404(b) in hearings outside the presence of the jury and obtained a running objection at trial. Assuming that West made a specific objection under Rule 404(b), we nevertheless conclude that the trial court did not err in admitting the extraneous evidence in this case.

The State next argues that West opened the door to the admission of the evidence of his drug use and his physical assaults by raising them in his opening statement. West's opening statement included the following:

> After Madeline there comes along a relationship with a girl by the name Carley Hill. And Dustin began dating Carley Hill at about the time of his divorce from Madeline, which would've been back there in 2010. He met her through a friend at Applebee's. And certainly, it goes without saying that Dustin and Carley's relationship was rocky, primarily due to substance abuse issues by both parties. We're not -- the evidence -- we're not going to sugarcoat the evidence in this case. We're going to tell it the way it is. This man has had a drug issue, been to a drug rehab program twice. Numerous altercations occurred between them but they always seemed to reconcile no matter what.

In regard to Cherice, West also noted in his opening statement:

Dustin and Cherice's relationship deteriorated which resulted in two altercations.

"Evidence that is otherwise inadmissible may become admissible when a party opens the door to such evidence." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) (citing *Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009)); *Sandoval v. State*, 409 S.W.3d 259, 302 (Tex. App.—Austin 2013, no pet). A party opens the door by leaving a false impression with the jury that invites the other side to respond or presents a defensive theory that requires rebuttal. *Hayden*, 296 S.W.3d at 554; *Daggett v. State*, 187 S.W.3d 444, 452 (Tex. Crim. App. 2005); *Sandoval*, 409 S.W.3d at 302. When a party opens the door, opposing counsel is permitted to present otherwise inadmissible evidence to correct the mistaken or false impression or to rebut the defensive theory. *See Wheeler v. State*, 67 S.W.3d 879, 885 (Tex. Crim. App. 2002); *see also Houston v. State*, 208 S.W.3d 585, 591 (Tex. App.—Austin 2006, no pet.). The door to inadmissible evidence may be opened during a defense opening statement. *See Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008); *see also Gaytan v. State*, 331 S.W.3d 218, 225 (Tex. App.—Austin 2011, pet. ref'd).

West opened the door to the admission of the extraneous evidence against him through his opening statement when he referred to his "altercations" with Hill and Cherice and his drug use. The testimony elicited from Hill and Cherice regarding the physical abuse at West's hands and his history of drug use corrected the inaccurate picture left by counsel's opening statement.

Even if West had not opened the door to the extraneous offenses, they were nonetheless admissible under Rule 404(b). We review a trial court's ruling on the admissibility of extraneous-offense evidence for an abuse of discretion. *Williams*, 301 S.W.3d at 687; *see also Gerron*, 524 S.W.3d at 320. As long as the trial court's ruling is not outside the "zone of reasonable disagreement," there is no abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *see also Newton v. State*, 301 S.W.3d 315, 317 (Tex. App.—Waco 2009, pet. ref'd) (citing *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009)). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). The trial court's decision to admit proof of other crimes is generally within this zone if the evidence "is relevant to a material, non-propensity issue." *Id.*; *see also Patterson v. State*, 496 S.W.3d 919, 929 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd).

Cherice and Hill testified that they were physically abused by West when they challenged, disagreed or argued with him. Their testimony provided some evidence from which the jury could infer that Z.R.'s injuries were intentionally inflicted, particularly in light of West's texts that he had spanked Z.R., that he believed Z.R. needed a "whooping," and that Z.R.'s "whining" had to stop. Additionally, the method West used in abusing Cherice and Hill—the headbutting—was particularly relevant in light of the similarity of the injuries suffered by Cherice and Z.R.

Based on the foregoing, we cannot conclude that the trial court's ruling was outside the zone of reasonable disagreement. *See De La Paz*, 279 S.W.3d at 344.

Accordingly, the trial court did not abuse its discretion in admitting the extraneous-offense evidence over West's Rule 404(b) objection. West's second issue is overruled.

## *Rule 403*

West argues in his third issue that the trial court should have excluded the extraneous offense evidence under Rule 403 even though it may have been admissible under Rule 404(b). Even if a party opens the door to rebuttal evidence or evidence is admissible under Rule 404(b), the trial judge still has the discretion to exclude the evidence under Rule 403 if its probative value is substantially outweighed by a danger of unfair prejudice, confuses the issues, or misleads the jury. *Hayden*, 296 S.W.3d at 554; *see also Kulow v. State*, 524 S.W.3d 383, 387 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd).

> When undertaking a Rule 403 analysis, the court must balance
>
> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. Of course, these factors may well blend together in practice.

*Newton*, 301 S.W.3d at 319 (quoting *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006) (footnote omitted)); *see also Casey v. State*, 215 S.W.3d 870, 880 (Tex. Crim. App. 2007). "'[P]robative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Casey*, 215 S.W.3d at 880. "'Unfair prejudice' refers to a tendency to suggest

decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* at 883. Evidence is unfairly prejudicial when it tends to have some adverse effect upon the defendant beyond tending to prove the fact or issue that justifies its admission into evidence. *Gerron*, 524 S.W.3d at 321. Rule 403 should be used sparingly and envisions exclusion only where there is a clear disparity between the degree of prejudice of the offered evidence and its probative value. *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009); *see also Hedrick v. State*, 473 S.W.3d 824, 833 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Trial courts should favor admission in close cases. *Casey*, 215 S.W.3d at 879.

We conclude that the extraneous evidence had little, if any tendency to mislead or confuse the jury, and that any such tendency was substantially outweighed by its probative value to show West's intent and to rebut the theory that Z.R.'s injuries were the result of an accident. The trial court's finding that the danger of unfair prejudice did not substantially outweigh the probative value of the extraneous evidence was not an abuse of discretion. We overrule West's third issue.

### *Jury Instruction*

In his fourth issue, West asserts that the trial court erred in delivering an incorrect instruction to the jury. Specifically, West argues that the jury instruction regarding extraneous offenses included a list of acceptable uses of extraneous-offense evidence, none of which had application to the facts of his case. West did not object to the jury charge.

We review claims of jury charge error under the two-pronged test set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). We first determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If error exists, we then evaluate the harm caused by that error. *Id*. If there is no error, our analysis ends. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012).

*Graves v. State*, 452 S.W.3d 907, 910 (Tex. App.—Texarkana 2014, pet. ref'd). If an error was properly preserved by objection, reversal will be necessary if the error is not harmless. *Almanza*, 686 S.W.2d at 171; *see also Brock v. State*, 495 S.W.3d 1, 13 (Tex. App.—Waco 2016, pet. ref'd). Conversely, if error was not preserved at trial by a proper objection, a reversal will be granted only if the error presents egregious harm, meaning appellant did not receive a fair and impartial trial. *Id*. To obtain reversal for jury-charge error, appellant must have suffered actual harm and not just merely theoretical harm. *Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012); *Arline v. State*, 721 S.W.2d 348, 352 (Tex. Crim. App. 1986).

The trial court gave the following instruction in the jury charge:

The Defendant is on trial solely on the charges contained in the Indictment. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. However, such evidence may be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident or to rebut a defensive theory.

The State has introduced evidence of extraneous matters other than the offenses charged in the Indictment in this case. You are instructed that said evidence was admitted for the purpose of showing proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident or to rebut a defensive theory if it does. You are further charged that if there is any evidence before you in this case tending to show the Defendant committed the extraneous transaction, you cannot consider

said evidence for any purpose unless you first find and believe beyond a reasonable doubt that the Defendant committed said extraneous transaction. If you find and believe beyond a reasonable doubt from such testimony that the Defendant committed the extraneous transaction, you may consider the same for the purpose for which it was introduced, namely as evidence of proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, or to rebut a defensive theory, if any, and for no other purpose.

The instruction was an appropriate statement of the law regarding extraneous acts. *See Blackwell v. State*, 193 S.W.3d 1, 15-16 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); *see also Mason v. State*, 416 S.W.3d 720, 742 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (approving a similar jury charge). The *Blackwell* court noted:

The trial court's instruction for the jury to consider the extraneous offense in determining appellant's preparation, plan, opportunity, knowledge, identity, or absence of mistake or accident amounted to surplusage that the jury could readily disregard because those issues were not pertinent to the trial. Although the charge did not address appellant's defensive theory . . . the charge specifically limited the extraneous offense evidence to issues other than character conformity. Therefore, although not as narrowly tailored to the specific issues involved as it could have been, the charge correctly instructed the jury to limit its use of the extraneous offense evidence to issues that were properly before it. . . .

*Id*. at 16. We have approved a similar jury instruction. *See Bailey v. State*, No. 10-11-00437-CR, 2012 WL 4841465, at *6 (Tex. App.—Waco Oct. 11, 2012, no pet.) (mem. op., not designated for publication).[4] We noted in *Bailey* that the jury charge tracked the language

---

[4] Under Rule 47.7(a) of the Rules of Appellate Procedure, unpublished memorandum opinions not designated for publication have no precedential value but may be cited with the notation, "(not designated for publication)." Unpublished memorandum opinions are persuasive rather than binding precedent that the court may follow or reject. *See Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

of Rule 404(b) and that Texas courts have held that "[a] jury charge which tracks the language of a particular statute is a proper charge on a statutory issue."  *Id*. (quoting *Riddle v. State*, 888 S.W.2d 1, 8 (Tex. Crim. App. 1994)).

Additionally, the record reflects that the extraneous offenses that were presented by the State fell into at least two of the exceptions of Rule 404(b):  (1) to rebut West's defense that Z.R.'s death was the result of an accidental fall; and (2) to establish an element of the offense—that West acted "knowingly."  We conclude that the language of the extraneous-offense instruction contained in the jury charge in this case properly instructed the jury to consider the extraneous-offense evidence for only the purposes permitted by Rule 404(b).  West's fourth issue is overruled.

### *Denial of Fourth Motion for Continuance*

In his fifth issue, West asserts that he was deprived of his constitutional right to present a defense through the testimony of his expert witness because the trial court denied his Fourth Motion for Continuance.  The denial of a motion for continuance is within the sound discretion of the trial court, and we review a trial court's denial of a motion for continuance for an abuse of discretion.  *Renteria v. State*, 206 S.W.3d 689, 699 (Tex. Crim. App. 2006); *see also Gutierrez v. State*, 446 S.W.3d 36, 38 (Tex. App.—Waco 2014, pet. ref'd).  "[G]reat deference must be shown to trial courts, because of the scheduling problems they face."  *United States v. Cronic*, 466 U.S. 648, 662 n. 31, 104 S.Ct. 2039, 2048 n. 31, 80 L.Ed.2d 657 (1984); *see also Cates v. State*, 72 S.W.3d 681, 692 (Tex. App.—Tyler 2001, no pet.).  An appellant claiming the erroneous denial of a motion for

continuance must show: (1) the trial court erred in denying the motion for continuance; and (2) such denial harmed him in some tangible way. *Gonzales v. State*, 304 S.W.3d 838, 843 (Tex. Crim. App. 2010). A motion for continuance based upon the unavailability of a witness is governed by statute and must include the diligence used to secure the witness's presence at trial. *Id.; see also* TEX. CODE CRIM. PROC. art. 29.06(2) (West 2006) (a first motion for continuance requesting delay "on account of the absence of a witness" must "state" "[t]he diligence which has been used to procure his attendance") and art. 29.07 (subsequent motions for continuance must comply with art. 29.06 and also state that the "testimony cannot be procured from any other source known to the defendant" and that the defendant has a "reasonable expectation of procuring the same at the next term of the court.").

West's Fourth Motion for Continuance requested that the trial date be rescheduled from August 31, 2015 until some time in October because his expert witness, Dr. Laura Liptai, was scheduled to be out of the country or, alternatively, that the trial be recessed, if necessary, to allow her to testify on the dates she would be available on September 21st, 22nd or 30th. West's Second and Third Motions for Continuance were also due to the unavailability of Dr. Liptai and another expert. While West's motion may comply with most of the statutory requirements, the trial court could reasonably have concluded that West agreed to the August 31st setting and that he failed to establish due diligence in obtaining Dr. Liptai's presence.

After a hearing on May 26, 2015 on West's Third Motion for Continuance, the trial court set the jury trial for August 31, 2015. At that hearing, the following exchange took place:

THE COURT: Let's take up a motion to continue.
    [Defense Attorney].

ARGUMENT

[DEFENSE ATTORNEY]: Your Honor, I would simply allude to the verified Motion For Continuance that we have filed on this matter. Two grounds. If she is not going [to] be available for trial - - she is a material witness. We've set forth in our verified motion the significance of her as a witness in this case, as well as we've also alluded to some other issues that have come up with respect to additional evidence that we believe that we need in order to proceed with trial in this case. So I would simply rely upon the motion that's been filed with the Court.

THE COURT: Response.

RESPONSE

[PROSECUTOR]: Generally we're opposed, Judge, but based on the earlier conversations with the Court and in all fairness I would just assume the Defense have all their witnesses present whenever we do have a trial. So that's our position.

THE COURT: Very good.

THE COURT'S RULING

THE COURT: Motion is granted.
    Did y'all agree on a new trial date? Was it August 31st?

[DEFENSE ATTORNEY]: Judge, we don't want to shoot from the hip here, neither side, and we've talked to Joy about this and what we would ask the Court to do is allow us to make sure that there's no problems both from my standpoint and the State's standpoint and we will get with her tomorrow and let her know for sure if there's no conflicts.

[PROSECUTOR]:  We've talked to all of our witnesses except for one for August 31st and, you know, upon hearing from them we I'm pretty confident that August 31st is a good date for us.  The State also, as we have said before, would be available July 6th.

THE COURT:  All right.  I'll hold off until tomorrow then.

The order setting the August 31 trial date was signed two days after the hearing.  There is nothing in the record to indicate that West informed the trial court of any possible conflicts or that he lodged any objection to the August 31st setting.

Even if the trial court did err, West failed to show that he was harmed in some tangible way.  Dr. Liptai possesses a Ph.D. in BioMedical Engineering and provided the following overview of that field in her expert report:

> BioMedical engineering studies the effect of forces and motions on bones, joints, and other systems and structures of the body.  The field utilizes mechanical laws derived from physics and engineering to study the principles of the action of forces and their effects on biological tissues.  BioMedical engineering is an integrated and interdisciplinary field focused on the cause or mechanics/kinematics of trauma, rather than medical diagnosis, prognosis, or treatment of injuries.  BioMedical engineers utilize scientific/engineering principles and experimental as well as epidemiological data to describe and/or quantify the mechanics of trauma.

Dr. Liptai's report also identified the scope of her investigation:

> The scope of the research is based on BioMedical Engineering, and does not include forensic pathology or medical causation (i.e. medical diagnosis).  Dr. Liptai will not testify if the injuries were or were not related to the incident.  Dr. Liptai's BioMedical Engineering scope of work is to test the accelerations and kinematics of the head impact utilizing peer reviewed and published engineering methodologies including:  1) rely upon the diagnoses and medical findings of the health care providers (including the fracture evidence), 2) utilize federal engineering standards for head impact and compare these peer reviewed standards to the objective experimental quantification of the acceleration/force involved in impacting the left side of the head of a Hybrid-III 3-year-old crash test dummy (to the rocker panel of an exemplar vehicle and subsequent impact on the ground), and 3)

explain the significance of the experimental findings. Dr. Liptai did not test for hypothetical activities/abuse/impacts or quantify the force on other parts of the body.

Dr. Liptai's report further notes the following: "Dr. Liptai will not testify about medical causation including diagnosis, cause of death, etc. She will rely upon the medical doctors/forensic pathologists for this data. Dr. Liptai will testify with respect to the BioMedical Engineering aspects of the case." The report notes that Dr. Liptai bases her analysis upon two statements given by West: 1) the written statement given to law enforcement the day of Z.R.'s death; and (2) the statement given to Davis approximately one week after Z.R.'s death. Dr. Liptai's report concludes after her analysis:

> Testing indicates that the force of an impact at the rocker panel of a 2001 Dodge Ram 1500 to the left skull area of a Hybrid-III anthropometric dummy would be <u>over the federal tolerance</u> for brain injury. Further testing indicates there is a mechanism for multi-directional, multi-planar impact to the child's head.

(emphasis in original). In short, Dr. Liptai opines that Z.R.'s skull fracture and other head injuries could have been caused by impacting the truck's rocker panel and door and then the ground. There is nothing in Dr. Liptai's report, however, that explains why she analyzed the impact of a child's head to the rocker panel and door of a truck, followed by an impact with the ground. This sequence of events is contrary to every statement given by West regarding the cause of Z.R.'s injuries. Exhibit D to Dr. Liptai's report, which includes the various statements from West she considered in reaching her findings, also does not provide any mention of Z.R. striking the rocker panel or the truck before hitting the ground. Dr. Liptai's report, therefore, was not based upon a theory that was supported by the evidence and its exclusion could not have harmed West.

Additionally, the information that Dr. Liptai would have provided was elicited from Dr. Greenberg, who testified on cross-examination that the skull of a two-year-old could possibly be fractured by impacting the rocker panel of a truck. Although Dr. Greenberg also noted that she could conceive of no way that Z.R.'s skull fracture could have occurred by impacting the rocker panel given the description of Z.R.'s fall by West, she provided at least some evidence of West's defensive theory. The jury implicitly rejected that theory by its verdict. We conclude that the trial court did not abuse its discretion in denying West's Fourth Motion for Continuance. West's fifth issue is overruled.

Having overruled all of West's issues, we affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Affirmed
Opinion delivered and filed July 25, 2018
Do not publish
[CRPM]

